GEORGE E. CHRISTILAW, Harvey J. Christilaw, and Jennie Christilaw, Appellants, v. FIRST NATIONAL BANK OF ASHLEY, NORTH DAKOTA, a Corporation, Respondent.

(215 N. W. 470.)

**Pleading — permitting amendment not requiring change in defense within court's discretion.**

1. Under § 7482, Comp. Laws 1913, the trial court in the furtherance of justice has a wide discretion in allowing amendments to pleadings, and an order permitting the filing of an amended complaint will not be disturbed when it appears from the record that the defense has not been substantially changed by the amendment.

**Banks and banking — bank selling land should pay mortgage out of proceeds — agreement with owner.**

2. The evidence in this case proves, that the defendant bank through its president, and cashier, sold the plaintiff's land upon which it had a mortgage under an agreement with the plaintiff, that the land was to be sold, the mortgage paid out of the proceeds of sale, and the balance less five per cent commission, paid to the plaintiff. The land was sold, and the cash was far in excess of the amount due on the mortgage, but no payment was made on the mortgage, and after holding the deed for nearly two years it was returned with the information, that, it was not the bank's deal and the mortgage was foreclosed. *Held*, that it was the duty of the bank official to pay the mortgage out of the proceeds of the sale of the land; that the foreclosure is void, and plaintiff is entitled to judgment setting aside the foreclosure sale, to a cancellation of the mortgage, the mortgage indebtedness, and for the balance of the purchase price of said land.

Opinion filed August 20, 1927. Rehearing denied October 22, 1927.

Banks and Banking, 7 C. J. § 651 p. 785 n. 95. Mortgages, 41 C. J. § 1497 p. 1033 n. 88. Pleading, 31 Cyc. p. 368 n. 9.

Appeal from the District Court of McIntosh County, *McKenna*, J. Reversed.

*Wishek & Wishek* and *Lauder & Lauder,* for appellants.

*Curtis & Remington,* for respondent.

Note.— (1) Rule as to permitting amendments to pleadings within discretion of court, see 21 R. C. L. 573; 3 R. C. L. Supp. 1170; 5 R. C. L. Supp. 1164; 6 R. C. L. Supp. 1274.

BURKE, J. This action was originally brought as an action at law, and on an objection to the introduction of evidence, the plaintiff asked, and was granted leave upon terms to file an amended complaint.

It is the contention of the defendant, that the overruling of his objection to the amended complaint, was error on the part of the trial court, and that is the first question to be determined.

Section 7482, Comp. Laws 1913, provides that:

"The court may, before or after judgment in furtherance of justice and on such terms as may be proper, amend any pleading, process or proceeding by adding or striking out the name of any party; or by correcting a mistake in the name of a party, or a mistake in any other respect; or by inserting other allegations material to the case; or, when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved."

Under this section the trial court in the furtherance of justice has a wide discretion to amend pleadings before trial, at the trial or even after judgment, so long as the amendment does not change substantially the claim or the defense. The material evidence is all in correspondence between the parties, and would be the same evidence whether the action was tried on the original or amended complaint. Therefore, it was entirely within the discretion of the trial court to grant leave to amend the complaint.

After the overruling of the objection the defendant answered, the case was tried, and findings of fact and conclusions of law were found by the trial court favorable to the defendant, and the plaintiff appeals.

On March 23, 1915, one Margaret J. Christilaw, being indebted to the Union State Bank of Ashley, North Dakota, in the sum of $900 gave the said bank as security therefor a mortgage on 160 acres of land in McIntosh county. In 1915 Mrs. Christilaw moved to Oshkosh, Wisconsin, and on December 28, 1916, she willed a three-fourths interest in said land to her son, George E. Christilaw, and a one-fourth interest to her son, Harvey J. Christilaw. On February 10, 1917, Margaret J. Christilaw died, and George E. Christilaw began proceedings to probate the will.

On April the 9th 1917, George E. Christilaw enlisted in the service of the United States in the World War, and did not return until October, 1919.

On May 28, 1917, the Union State Bank of Ashley having been organized, as the First National Bank of Ashley, assigned the said mortgage to the said First National Bank of Ashley, the defendant. T. S. Johnstone had been president of the Union State Bank of Ashley, and was also president of the First National Bank when organized, and his brother C. A. Johnstone was cashier of the old Union State Bank, and also, cashier of the First National Bank, and both continued as such, acting in control and management of affairs of the said First National Bank of Ashley, up to the year 1922.

After the Christilaws moved to Oshkosh, the defendant bank looked after the land, collected the rents which it credited on the mortgage indebtedness amounting to $180. On January 4, 1919, a three-fourths interest in the land was decreed to George E. Christilaw, and a one-fourth interest to Harvey J. Christilaw. On the 10th day of July, 1919, thereafter, George E. Christilaw, Harvey J. Christilaw and Jennie Christilaw, his wife, by a warranty deed conveyed the land to the defendant bank.

It is the contention of the plaintiffs, that the defendant bank agreed to sell the said land, pay off the said mortgage, and turn over to the plaintiff the balance of the purchase price, and that in accordance with agreement the defendant bank sold the land to one Ludwig Schweigert in 1918, that he was put in possession of the land in November, 1918, and has been in possession all of the time since. That said Schweigert paid to the defendant bank a large sum of money the exact amount of which is unknown to the plaintiff but the amount paid was far in excess of the mortgage due to the said defendant bank, that the defendant in violation of its agreement, and in fraud of the rights of the plaintiff failed, neglected, and refused to satisfy said mortgage.

It is the contention of the defendant that whatever deal the plaintiffs had in relation to the land, was with H. S. Johnstone personally, and not with the defendant bank, that the defendant is now owner of the land by a valid foreclosure of a mortgage; that the defendant is a National Bank and the contract, if made, was in excess of the authority of said bank. Whatever deal was made between the plaintiff and the defendant, was by correspondence, most of it through the president of the bank, T. S. Johnstone, but the correspondence was begun by C. A.

Johnstone, the cashier, in a letter dated August 15, 1917, to George E. Christilaw in which he says:

"We have a party that may buy your land provided he can get it right. We might be able to get $1,600 or $1,700, for the 120 down by the lake, and think if you get that you had better let it go and stop the interest.

"As you know the loan to us is long past due and we must have it taken care of before the 1st of October, and if you do not care to sell you had better make some arrangements before that time.

"Kindly let us know at once whether you will sell or not, and give us a price on each piece."

It will be noted that the important thing in this letter is the collection of the mortgage indebtedness, and the cashier advises Christilaw, that he had better take $1,600 or $1,700 and stop the interest, and the only way, the interest could be stopped would be by paying the mortgage indebtedness. He then warns Christilaw, that the loan must be taken care of before the first of October, and that if he does not care to sell the land he had better make some arrangements before that time. It is clear that this letter is written for the defendant bank and for the purpose of collecting the mortgage indebtedness.

On August 11, 1919, C. A. Johnstone wrote the following letter:

Aug. 11, 1919.

Mr. E. R. Hicks,
Oshkosh, Wis.
Dear Sir:

We wish to acknowledge the receipt of your letter inclosing Warranty Deed of George E. Christilaw single, Harvey J. Christilaw and Jennie Christilaw, his wife to this bank, conveying the S$\frac{1}{2}$ of the SE$\frac{1}{4}$ and the SE$\frac{1}{4}$ of the SW$\frac{1}{4}$ section 28, township 130, range 69, for the consideration of $2,000.

We have had an abstract of the title prepared covering this land and it fails to show the United States patent or where any action has been taken in the probation of the estate of Margaret J. Christilaw, deceased. Before we can make final payment it will be necessary for you to have the patent and also final decree of distribution placed on record at the office of the Register of Deeds of this county.

Trusting you will give this your prompt attention so we can have this matter closed up in the near future, we are

Very truly yours,<br>
C. A. Johnstone<br>
Cashier.

CAJ :JW.

And on March 30, 1920, T. S. Johnstone, president of the defendant bank wrote the following letter (plaintiff's exhibit Q).

March 30, 1920.

Mr. E. R. Hicks
Oshkosh, Wis.
Dear Sir:
I just had a letter from Mr. Christilaw in regard to his land here which he sold us, wanting to know why this wasn't settled up. The cashier of the bank tells me that he wrote you a letter August 11, 1919 requesting you to look up the patent of the land and also the final decree of distribution which should be filed here in the office of the Register of Deeds, and he says up to this time that he has never had an answer to that letter. Has this estate been probated or in what form does it stand now so that we will know what to do.

Very truly yours,<br>
T. S. Johnstone<br>
President.

TSJ :J.W.

It will be noted in this letter, T. S. Johnstone says "the cashier of the bank tells me that he wrote you a letter August 11, 1919, requesting you to look up the patent on the land, and also, the decree of distribution which should be filed here in the office," and he says, "up to this time that he has never had an answer." This letter is written on the regular letter head paper of the bank, signed by T. S. Johnstone, president, and shows that the president and the cashier were working together in the deal.

On February 19, 1920, attorney Hicks wrote to Mr. C. A. Johnstone, cashier, as follows:

"In the Christilaw matter, responding to your letter of Aug. 11th last, we sent you certain enclosures. We have heard nothing from you since that time.

"We would appreciate it, if you would close this matter up without further delay."

On April 9th 1920, attorney Hicks sent the final judgment and probate proceedings to the register of deeds of McIntosh County. On May 18th he sent the patent to the land, for record.

George E. Christilaw did not receive C. A. Johnstone's letter of August 15, 1917, he having in the meantime, enlisted in the World War and was overseas, but on the 16th of March 1918, H. J. Christilaw had a letter written to C. A. Johnstone stating that before leaving for France, George said, not to take less than $2,000 for the lake place, and as his share of the property is three-fourths I would not agree to take less.

On March 30, 1918, T. S. Johnstone wrote to Harvey Christilaw in which he says, "I am writing you again in regard to your land as the man who wants to buy it has not enough cash and would like to have you carry him for a year or two for $1500, and he would like to have the rate of interest as cheap as possible. If you can make the sale it will make quite a lot of difference to you as you will receive 5 per cent, instead of paying 10 per cent interest, as you have been doing in the past years. Now I am in a position to make this deal at once, but think I should have something for it, and we have been allowed 5 per cent in all dealings." In this letter Johnstone says, "I am writing you again in regard to your land." T. S. Johnstone had not written before. The first letter was written by C. A. Johnstone, which shows that T. S. Johnstone knew about the other letters for he says, "I am writing you again," and it is clear from this letter that the important thing in view, is the collection of the mortgage indebtedness for he says, "It will make a lot of difference to you if there is a sale, you will receive 5 per cent, instead of paying 10 per cent interest, as you have been doing in the past years." This means, of course, that the mortgage would be paid and the 10 per cent would cease, and the 5 per cent to Christilaw would commence.

The defendant introduced in evidence a copy of a letter dated April 8, 1918, being exhibit 5, as follows:

My dear Mr. Christilaw:

Your letter received and note what you say in regard to the land and I will say that our party will take it for $2,000 we to get our commission and give him a good title and he would like to have you carry as much of it as you can until fall and then you would get all of your money he will make a good payment down. I will see Shubeck today and find out the condition of the title and will write you again.

This is a copy of a letter and is not signed, but presumably it was written by C. A. Johnstone for it is an answer to "Ex. 6" the letter written by Christilaw to C. A. Johnstone in which he fixes the sale price of the property at $2000.00. It is the only letter that H. J. Christilaw had written up to that time, but the letter "Ex. 5" may have been written by T. S. Johnstone, for it is answered on April 27th by H. J. Christilaw in a letter which he addressed to T. S. Johnstone, and in which he says, "Yours of the 15th instant at hand saying you would take the 120 near the lake at $2000.00 cash, commission not to be over 5 per cent," but whether exhibit 5, was written by C. A. Johnstone or T. S. Johnstone, it is clear that both were interested in the collection of the mortgage debt.

On November 26, 1918, George E. Christilaw wrote to T. S. Johnstone the following:

"I have your letter of November 22nd to my brother Harvey Christilaw.

"In reply, I beg to say at the time I enlisted in the Government service to go abroad in this war, I gave to my brother the power of attorney to act for our joint interests in our lands in North Dakota. He owns a one-fourth interest and I own a three-fourths interest. He tells me that some time last spring he received an inquiry from you in reference to selling this land, and he wrote you at that time that we would sell it for $2000.00 cash. He never heard from you, and did not know you had bargained even to sell the land; but that the land was rented on the terms that it had previously been rented, and that you were handling it in that manner. We were pleased, if you succeeded in selling it; but we want to know the details so that we can close up the deal.

"Will you please send us a complete and itemized statement in reference to your handling these lands, to whom you have rented them, and

for what, and how much has been paid, to whom you sold and at what price, and how much has been paid, and when and if the funds paid in to our credit on these lands have been drawing interest; and also any and all expense or disbursements that you have made in our behalf.

"We were settling my mother's estate when I was called to Government Service, and it was practically through at that time, except closing up some minor details. Now that I am at liberty, I shall immediately close up that estate and this will furnish our authority for making conveyance to the purchasers pursuant to your agreement, so that we must request that no proceedings in foreclosure be commenced as that would be entirely unnecessary and an additional expense which we do not need to have.

"We shall probably be ready to make our conveyance and furnish our authority for record in your State as soon or immediately after we receive your statement as above requested.

"Thanking you for your interest and kindness in this matter, I am,

"Very truly yours,

"Geo. E. Christilaw."

It will be noted that George E. Christilaw in this letter intends that the mortgage indebtedness shall be paid out of the proceeds of the sale of the land, for he says, the matter can be closed up, and it will not be necessary to foreclose, which means, of course, that the mortgage would be paid and foreclosure would not be necessary.

On January 4, 1919, T. S. Johnstone, president, wrote to Geo. E. Christilaw:

"Your letter received sometime ago in regard to the land but have been too busy to take care of this, but now as we have more leisure time we are going ahead and settle this matter one way or the other. I had some communication with your brother last spring in which we agreed to sell the land for $2000.00 cash. I was to get $100.00 commission, and which I did do, and the fellow is waiting for a deed. The way I understood Harvey was to go ahead and probate the estate, so as to give this party a deed, as we thought it would be better than to go ahead and foreclose and get a sheriff's deed. All rents have been applied on your note, but the note has been taken out of the bank, ordered out by the examiner some time ago, we are carrying it ourselves. The note amounts to $800. We applied the rent $180 on interest and principal

last year, all renting having been applied on the note since you left here, which can account for. Sorry we did not take this up some time ago and have this about settled. This party is paying 6 per cent since April 1, which amounts to about $120 rent. If you can give us a deed we will be glad to wait for it, it will take some time to get a sheriff's deed by foreclosure and probably would be less expensive to probate the estate. The only thing to do will be to clean it up as soon as we can as there will be more money for you and for us. I remember this price including the three 'fortys' at the lake the other 'forty' you have yet. We would try to give you a fair price now."

In this letter, the president of the defendant bank, says, "the only thing to do will be to clean it up as soon as we can, and there will be more money for you and for us." He does not say more money for you and for me, but, "more money for you and for us." The only time he ever made any personal claim was in reference to the commission of 5 per cent, in other things it is "us" or "ours," in this letter he says, "The note has been taken out of the bank, ordered out by the examiner some time ago. We are carrying it ourselves." Who are ourselves? Not. T. S. Johnstone, he must mean the officers of the bank, and here again he impresses upon the plaintiff the necessity of taking care of the mortgage indebtedness, and he used the statement that "the note has been taken out of the bank" to show the necessity for action. This letter is dated January 4th, and on February 5, 1919, thereafter he wrote the following letter:

"I have not got an answer to my letter written you in regard to your note. Now, George, we have been ordered to take this note out of the bank by the examiner and it will have to be done. What are you doing in regard to probating the estate?

"If we were assured by you that you can get us a deed in a short time we can go ahead and fix this up with the man that we have sold this to. It would have been the best way to handle it if you were in a position to give him a deed and I think the price he offered you was fair price. Now let me know by return mail what you are doing in regard to clearing up the title."

The mortgage indebtedness is the important thing mentioned in this letter, and while he states in the letter of January 4th that the note was taken out of the bank, ordered out by the examiner, in the letter of

February 5th just one month later he states, "the bank examiner has ordered the note out of the bank and it will have to be done."

There are many letters from Mr. Hicks to Mr. Christilaw, asking for settlements, and on March 15, 1921, T. S. Johnstone wrote to E. R. Hicks in which he says, that, "the business has dragged along, that he has been sick for six months, but getting better. There was a little mix up on the land when it was bought, it was sold to a farmer, contract for deed, and he has not been able to pay one dollar since we sold it to him." He does not say, since I sold it to him, he says, "since we sold it to him."

On March 20th Hicks wrote to T. S. Johnstone saying, "You realize that this delay in view of the history of the matter and the physical infirmity contracted by Mr. Christilaw in the war is not satisfactory. Would it not be better for you to make immediate settlement? I think so, shall expect it." On May 28, 1921, Hicks wrote again to Johnstone, asking for a settlement, again on June 17, 1921. In this letter he states, "I regret to be obliged to say to you, and I am very loath to do so, but my client insists that I shall say, that unless this matter is now taken care of that he will insist upon this being presented to the proper bank authority for investigation." It is clear that Mr. Hicks thought he was dealing with the bank for if he was dealing with Mr. Johnstone personally he would not have suggested the bringing of the matter before the bank authorities.

On July 19, 1919, Hicks wrote to T. S. Johnstone stating; "that he had just received a statement from the auditor of McIntosh County, that there were delinquent taxes against the land section three amounting to $29.28; section 28, $148.44. Please advise as the taxes will be taken care of. I am sending this letter by registered mail."

On August 2, 1921, T. S. Johnstone wrote to Hicks stating, "In regard to the taxes will say that the bank has paid all taxes and holding receipts. There is a fellow on the place and he has never paid anything, for two years; I have been unable to attend to anything for the past year, now I want to have this all cleaned up this fall has been impossible to pay out any this summer. I sure thank you for having been so patient. I expect to go home within two or three weeks."

On August 12, 1921, October 29, 1921, and December 15, 1921, Hicks wrote to T. S. Johnstone and received no answer. In the letter of

December 15, 1921, he states: "My client is now insisting thatI should come to Ashley with the Federal Bank Examiner and look up this business, but I persuaded him to be patient a little longer, I know full well that in the position you occupy you would certainly appreciate the necessity of attending to the Christilaw matter at once." This reference to the position Johnstone occupied, means of course, his position as president of the bank. As president of the bank he would not want to be embarrassed or have the bank embarrassed by his management of the bank's affairs. This letter was dated December 15, 1921, and apparently Johnstone concluded, that it was time for him to act, for on January 2, 1922, Johnstone wrote Hicks saying, "I am returning deed, for the Christilaw land, as I never could complete the deal. The man who was buying the land promised to pay $2000.00 cash for the land. He has not been able to pay the $2000.00. I was the agent selling this land, not the bank. I had Mr. Christilaw make out the deed in the bank's name to protect all the parties. Christilaw was to get $1,900 and I was to get $100. . . . Now all we can do is to collect the rent, and call the deal off. The forty acres was rented out last year for $40.00, that is the hay land. This year it was rented for one-fourth the crop. The mortgage that the First National Bank holds on the land is way past due, and will have to be taken care of at once some way. All the rent that was got won't pay taxes and interest."

It is undisputed that on the 28th day of October 1918, the land was sold to one Ludwig Schweiger for $2400.00. Schweiger being told at the time, he could have five or six years to pay for it. He received a contract for a deed which was subsequently taken from him and on November 2, 1918, he paid $400 cash, and T. S. Johnstone gave him a receipt therefor. Schweiger went into possession of the land in October, and has been in possession ever since. On April 17, 1919 he gave T. S. Johnstone a check for $500 on the purchase price of the land, and paid the further sum of $606 in cash on the purchase price of said land, making in all $1506 that was paid on the land.

After T. S. Johnstone's letter of January 2, 1922, the bank foreclosed the mortgage on the land by advertisement, and bid in the property at the sale.

The deed to the bank was executed on the 10th day of July 1919, and was received at the bank not later than August 11, 1919, for on August

11, 1919, C. A. Johnstone, cashier, wrote exhibit 114, acknowledging the receipt of the deed and requesting further evidence of title which was furnished by the plaintiff. The deed was accepted by the bank and retained in its possession for nearly two years, and until the plaintiff threatened to report the matter to the Federal banking authorities, and then the deed was returned, and for the first time the claim was made, that T. S. Johnstone was acting as agent for the sale of the land and the bank had nothing to do with it. It seems clear from this evidence that the bank through its officers, the president, and cashier, undertook to and did sell the land and out of the proceeds of such sale the mortgage was to be paid, and the balance was to be paid to the plaintiff. The plaintiff did everything required under the agreement and the defendant did everything except to pay the plaintiff the difference between the mortgage debt and the sale price of the land. The deed was made to the bank, the plaintiff did not know the purchaser. The letters from the officers of the bank are nearly all on the bank stationery signed by the officers as president or as cashier. The president and cashier of the defendant bank could not help knowing from the correspondence that the plaintiff and his attorney were dealing with the bank in good faith, and relying on the bank to sell the land and pay the mortgage out of the proceeds of the sale.

The officers of the bank held the deed, and had the land tied up during all of the prosperous period, and when they knew that the land could not be sold, and that the plaintiff was a helpless invalid, they returned the deed with the information that it was not the bank's deal. It would be strange indeed, if banks through their officers can manipulate their securities so as to deprive innocent and trustful customers of their money and property. It was certainly within the scope of the authority of the president, and cashier, of the bank to collect the mortgage debt, and for this purpose to enter into an agreement to purchase the land, or to sell the land and pay the debt out of the proceeds of sale.

National banks are authorized to loan money on land under the Federal Reserve Banking Act of December 23, 1913, § 24 (U. S. C. title 12, § 371). National banks are authorized to purchase lands mortgaged to it in good faith, by way of security for debts previously contracted, under subdivision 2 of § 5137 (U. S. C. title 12, § 29). In the case

of Reynolds v. First Nat. Bank, 112 U. S. 405, 28 L. ed. 733, 5 Sup. Ct. Rep. 213, the court said:

"The national banking law, Revised Statutes, § 5137, provides that a national banking association may purchase such real estate as shall be mortgaged to it in good faith by way of security for debts previously contracted. The power to purchase the real estate in dispute, was, therefore, clearly conferred by the statute. The fact that, in order to secure the same debt, it purchased other real estate not mortgaged to it, cannot affect the title to the land which it was authorized to purchase. But if there was any force in this objection to the title, it could not be raised by the debtor, for where a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void but only voidable; the Sovereign alone can object. It is valid until assailed in a direct proceeding instituted for the purpose. Union Nat. Bank v. Matthews, 98 U. S. 628, 25 L. ed. 190; National Bank v. Whitney, 103 U. S. 99, 26 L. ed. 443; Swope v. Leffingwell, 105 U. S. 3, 26 L. ed. 939."

Under this decision the sale was valid because authorized by the statute. This authority is supported by numberless decisions cited in the notes on pages 679, 680, 682, 683, and 684. 6 Fed. Stat. Anno. The few cases to the contrary are cited as overruled on page 680.

After the case had been submitted, the trial court found that there was a mistake in the description of the land in the deed to the bank. This was clearly an unintentional mistake, and the plaintiff's attorney assured the court, and also this court, that a deed would be executed with a correct description without delay.

On January 4, 1919, T. S. Johnstone writes to George Christilaw, that $180 in rents had been credited on the mortgage leaving $800 due, $1506 had been paid on the purchase price of the land in April 1919, and deducting the $800 therefrom, the amount due on the mortgage, the $100 commission, and $110.79 taxes paid by defendant bank after April, 1919, leaves $495.21 to which must be added the balance of the purchase price of the land, viz.; $494 amounting to $989.21 the amount due the plaintiff from the defendant.

Now, therefore, upon the execution and delivery of a good and sufficient warranty deed by the plaintiff to the defendant correctly describing the said land, viz.: The north half of the southeast quarter, and the northeast quarter of the southwest quarter of section twenty-eight in

township one hundred and thirty, north of range sixty-nine west of the fifth principal meridian in the county of McIntosh, North Dakota, containing 120 acres; it is ordered that the foreclosure of defendant's mortgage on the said land, and also on the southwest quarter of the southwest quarter of section three in township 129 north of range sixty-nine west of the fifth principal meridian, and the sale of said land thereunder be, and is hereby set aside, and the said mortgage, and note or notes, which it secures is hereby cancelled and ordered delivered up to the plaintiff and it is further ordered that the plaintiff have and recover judgment against the defendant for the sum of $889.21 and his costs in both courts.

BIRDZELL, Ch. J., and BURR, CHRISTIANSON, and NUESSLE, JJ., concur.